Joseph P. Risch, Appellee, v. Consumers Petroleum Company and William Dieterich, Appellants.

Gen. No. 42,755.

Heard in the third division of this court for the first district at the October term, 1943.

Opinion filed February 2, 1944. Rehearing denied March 7, 1944.

ANDREW J. FARRELL, of Chicago, for certain appellant.

WYATT JACOBS and WALTER A. CHRISTOPHER, both of Chicago, for certain other appellant.

STACY W. OSGOOD, of Chicago, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

Joseph P. Risch filed a complaint in the circuit court of Cook county against Consumers Petroleum Company, John W. Greene and William Dieterich to recover damages for injuries suffered on Saturday, December 27, 1941 at Western avenue and Argyle street in Chicago. On motion of plaintiff, John W. Greene was dismissed from the case. A trial before the court and a jury resulted in a verdict for plaintiff in the sum of $3,500. Motions for judgment notwithstanding the verdict and in the alternative for a new trial, were overruled, and judgment was entered on the verdict. Each defendant appealed and filed separate briefs.

Plaintiff was 59 years of age at the time of the occurrence. He had been employed by a cigar manufacturer for 35 years, stripping tobacco, and his earnings were $18 per week. The manufacturer was lo-

cated at 2343 Farragut avenue, which is about four blocks north of Argyle street. The accident happened about 5:45 p. m. The plaintiff walked to Western avenue and south on the east side of Western avenue. It was raining and rather dark. He arrived at the northeast corner of Western avenue and Argyle street. Western avenue runs in a northerly and southerly direction and is 100 feet wide at this point from building line to building line. Argyle street runs in an easterly and westerly direction and is 66 feet wide from building line to building line. There is testimony that Western avenue is 75 feet wide from curb to curb and that Argyle street is 28 feet wide from curb to curb. Argyle street runs into Western avenue from the east, but does not extend west of Western avenue. Rails for north and southbound trolley cars are located in the center of Western avenue. There is a "Stop Sign" in the parkway between the curb and the north sidewalk of Argyle street, facing east and a few feet east of the east sidewalk of Western avenue. There were three occurrence witnesses, plaintiff, the codefendant William Dieterich and John W. Greene, the driver for the Consumers Petroleum Company, the corporate defendant. Dr. Richard F. Greening testified in reference to the nature and extent of plaintiff's injuries. Lester A. Clark, Alfred H. Frederick, Earl W. Radford and Walter J. Smith, court reporters, testified from their notes in the impeachment of both the plaintiff and the codefendant Dieterich with reference to statements made out of court. William Currin, a police officer assigned to the Accident Prevention Bureau, testified with reference to the happenings in his presence after the accident. After the accident plaintiff was put in the automobile of the codefendant William Dieterich and taken to the Ravenswood hospital. He sustained an oblique fracture of the tibia of the left leg and a fracture of the outer surface of the condyle of the femur of the right leg. His bill in the hospital amounted to $566.90 and a fair and reasonable charge

for the doctor's services would be $900. Plaintiff returned to work on June 15, 1942. The defendants are not questioning the amount of the damages. John W. Greene, called by plaintiff under section 60 of the Civil Practice Act, testified that he was driving an oil truck in a westerly direction on Argyle street. He had made a delivery of oil on Winnemac avenue, a block north, and was on his way to make another delivery in the vicinity of Irving Park boulevard and Western avenue, a mile and quarter south. It was dark and visibility was poor. It was raining and misty; his windshield wipers were working. He stopped his truck six or seven feet east of the east crosswalk of Western avenue. At this time plaintiff walked south on the crosswalk in front of his truck. The left side of the truck was two or three feet north of the center of Argyle street. The truck was six or six and one half feet wide. Witness saw a "reflection of lights" to his left as plaintiff started to pass in front of the truck. There were no cars parked near the corner. The lights reflected on the side windows of the truck. It seemed to the witness that "he was coming from the south and making a right turn onto Argyle." Witness did not see the other car. The lights seemed to be facing in witness's direction and they appeared to be 15 or 20 feet away from his truck. Plaintiff was almost past the truck at the time witness saw the lights. After plaintiff passed in front of the truck, witness started up his truck, drove two or three feet and heard a noise. He stopped, looked out the side of his truck and saw a passenger car alongside of the truck. It was a two-door sedan and the door on the left hand side was opposite the door of the truck, two or three feet separating the two vehicles. The driver of this car was William Dieterich. The car was close to the center line of Argyle street. He did not hear any horn. Witness sat in the driver's seat "for a minute." The driver got out of his car and came around the rear of

his car and remarked to witness: ''The man is in front of your wheel.'' Witness opened the door and got out. In the meantime Dieterich had the man underneath his arms and was lifting him up. Witness testified that plaintiff was in front of the front left wheel of his truck. He observed plaintiff from the time plaintiff left the curb, and said, ''the lights of my truck shone right on him.'' On cross-examination by the attorney for Dieterich, witness testified, ''I believe we saw signs on the Dieterich car where the man had brushed against the car and wiped the rain from it. That was the door on the side of his two-door sedan. The place where the water was brushed off was just about right opposite the driver. I didn't see the car. I saw the reflection of the lights. I couldn't tell how fast the car was going. The rear end of the car was on the crosswalk after the accident.'' He testified further that the left wheel of the truck was over the man's leg; that he told the police that the man walked into the door of the Chevrolet. He stated further that he did not see the man walk into the door. The attorney for the corporation asked the witness upon what he based his statement to the police that the man walked into the door of the Chevrolet and an objection by the attorney for the individual defendant was sustained. He stated: ''I looked at the door of the Chevrolet after the accident and I saw that something had brushed against the side of the door and wiped the rain clear from it.'' His headlights were lighted at the time of the accident. The right side of his truck was about four feet from the north curb of Argyle street when he stopped at the stop sign. The stop sign is about six feet east of the crosswalk. He testified further that ''the man passed in front of my truck. He walked in front of my truck and was just by the front of the truck, maybe one or two seconds, until I heard a noise and then I stopped. It was a sound like somebody running up a piece—like somebody running up

against a tin or something like that. It was a kind of a thud. My truck at that time was moving much slower than a walk, just starting out, moved a couple of feet and then stopped. I stopped right away quick after I heard the thud. I was north of the center of Argyle after I stopped, maybe a couple of feet. The other automobile was about three feet from my truck after I stopped. It was facing in a general direction east. He was facing my truck a little bit. My left front wheel was two or three feet from the crosswalk, that is, two or three feet east of the crosswalk after my truck had stopped the second time. I had not reached the crosswalk at that time." It was witness's impression that the automobile was coming from the south and turned into Argyle, although it could have been coming from the north and turning east into Argyle, "You could just make out an outline of a pair of glasses and they were blurred so bad you couldn't tell how far they were from you." Both drivers were taken to the district police station, where they remained a couple of hours. A statement signed by Mr. Greene was received in evidence without objection as plaintiff's exhibit. In this statement the witness said that the Chevrolet sedan turned to the right from Western avenue and that "the man walked into the side of the Chevrolet coach right at the door. The impact threw the man to the pavement and the left front wheel of my truck ran over his leg."

William Dieterich, the individual defendant, called as a witness by plaintiff, testified that he owned a two-door Chevrolet automobile, 1940 model; that before the accident he was visiting his mother at 5009 North Oakley, which at that point is one long block east of Western avenue, and a few doors north of Argyle street; that from there he drove to a store at Winnemac and Western avenues on an errand for his mother. Winnemac avenue is a block north of Argyle street. He then drove south on Western avenue to Argyle street. He

was in the southbound car tracks of Western avenue, making a turn east into Argyle street. His lights were on. He stopped a second or two for northbound traffic to pass. When he stopped he saw the truck about 125 feet east of Western avenue. When he started up again he saw "the truck was a little closer, I would say 75 feet." When he got to the northbound car tracks the truck was about 60 feet east of the crosswalk. When he got to the east curb line of Western avenue the truck was about 25 feet from the crosswalk, and when he got to the crosswalk the truck was about 15 feet from the crosswalk. The truck was moving, but he did not say how fast. He did not know if the truck stopped for the stop sign, that it "was traveling at all times I saw him." Interrogated as to whether on January 9, 1942 at his home he was asked by Mr. James O'Brien in the presence of Lester A. Clark certain questions and whether he made certain answers, he answered: "I think so." He was then asked whether at that time the following questions were asked and the following answers were made by him:

"Q. What about our truck? Where was it just at that time?

"A. The truck was coming right around the corner.

"Q. Was it stopped?

"A. The truck was stopped and started off again. The guy was on the floor.

"Q. It had stopped before?

"A. Yes."

He stated that he could not recall the questions or the answers. Mr. Dieterich testified further that it was raining; that his side window was "kind of blurry"; that he could see forward; that his lights were shining ahead; that he "never" saw a pedestrian on the crosswalk at any time; that when he approached the crosswalk his car was facing east; that both the windshield wipers were working; that he was able to

see the entire crosswalk as he drove towards it; that he did not see a man walking on the crosswalk; that he did not know which direction the man fell; that his car was a little south of the center line of Argyle at the time of the impact, maybe about three feet; that the man was lying right across the center line of Argyle and the truck was three feet north of the center line. "The man came in contact with my car first. I heard the impact right behind me, just a little back of me. The impact was with the left side of my automobile. The impact was between the door and the fender on the left hand side." He testified that he stopped within about five feet; that "I stopped as quickly as I can"; that he opened his right door and went around the rear of his car; that the first time he saw the man on the pavement was after he went around the rear of his automobile; that the truck was stopped but the driver had not opened the door; that "he opened the door when I started to pick up the man"; that when he picked up plaintiff, his head was facing to the south; that "before the impact I would say the truck was about 20 feet away from the crosswalk. The truck was about 25 feet east of the east crosswalk of Western avenue at the time the impact took place on the crosswalk." Officer Currin testified that he and Officer Glavin took statements from the drivers.

Plaintiff testified in his own behalf that when he arrived at the northeast corner of Western and Argyle he looked east and saw a truck about a block away. The truck was going west. He then looked west but did not see anything and he walked across proceeding south. When he got to the middle of Argyle street the truck was by the alley and going west at about 20 or 25 miles an hour. He was on the crosswalk. "Then I made a couple of steps and I looked back of me, then I saw a Chevrolet. Before I looked to the west and after I crossed the center of the street I saw an auto-

mobile about 10 feet away from me. It was going south. It was still on Western and facing southeast, kind of straddling. I started to go back, then the car hit me and spun me around. The car hit me before I knew anything. The front of the fender on the left side hit me. It knocked me right on the crosswalk. I laid on my shoulder and I had my leg facing north. I was there about a couple of seconds, then I tried to get up, then I saw the truck about 10 or 15 feet away from me. It was going fast. I put my head down. I was afraid they might run over my head. You see, I couldn't make it no more. They run over my legs, both of them, the left one more than the right one. I hurt my kneecap when the truck run over me, both of them.'' On cross-examination he testified that he could tell by the headlights that the vehicle a block away was a truck. When he got to the middle of the street the truck was near the alley, ''I would say 35 or 40 feet away.'' The truck was traveling north of the center of the street. He looked back of him and saw the automobile coming. He walked about five feet to the south of the center of the street. At that time he saw the automobile about 10 feet away to his right and he was standing still. ''I tried to get back, you see. It was facing back, kind of southeast, so it was on Western avenue. I kept looking at the automobile. I tried to get back. The front fender of the automobile hit me. I tried to step back and by that time when I tried to get back it hit me, the front fender hit me and spun me around and then I landed right in the crosswalk. I figure I was about 2½ to 5 feet south of the center when it hit me. I was standing still. . . . It only hit me and spun me around. I don't know whether I came in contact with the left front of the automobile or not.'' The attorney for the corporate defendant interrogated plaintiff relative to a pretrial deposition taken on August 8, 1943. He was asked

whether in that deposition the following questions were put to him and whether he made the following answers:

"Q. When did you see the truck?
"A. After it run over me.
"Q. Where were you lying with reference to the truck? Were you in front of it or behind it?
"A. I was in front of it."

In the trial he answered that he did not remember whether the questions were put to him or whether he made the answers. He was also asked as to the following questions and answers:

"Q. The front wheel, wasn't it?
"A. Yes.
"Q. You were under the front of that?
"A. Yes.
"Q. That was after everything happened, wasn't it?
"A. Oh, yes."

In the trial he admitted that the latter questions were put to him and that he gave the answers. He did not recall whether he was asked, "When you came to, you were in front of the left front wheel, weren't you?", and he did not recall that he answered, "Yes." He stated that the last time he saw the truck it was 15 feet away from him and that he "mentioned that." He was then interrogated by the attorney for the corporate defendant about an interview at the Ravenswood hospital on December 29, 1941 with Mr. James C. O'Brien, in the presence of a court reporter named Walter Smith. He was asked whether in that interview Mr. O'Brien asked him the following questions and whether he made the following answers:

"Q. How did this accident happen?
"A. How it happened?
"Q. Yes.

"A. I was walking across the street, one fellow coming from the west and was going north on Western avenue, and I was about 2 or 3 feet away from the curbstone, about 3 feet, and he cut the corner and he hit me and he knocked me under the Consumer oil truck and I got my both legs under there.

"Q. The front of the truck, was it?

"A. What?

"Q. He threw you under the front of the truck?

"A. Yes.

"Q. Which way were you going?

"A. I was going south.

"Q. What part of the truck hit you first?

"A. The front part, both of them. That one didn't hit me at all. I mean the Consumer's. He just ran over me after."

In the trial he answered that the questions were not put to him and that he did not make the answers. He was also asked as to whether Mr. O'Brien asked him the following questions and whether he gave the following answers:

"Q. This car was going to go north and turn the corner, is that it?

"A. Yes.

"Q. And hit you, and threw you back in front of that truck?

"A. Yes.

"Q. Was there anybody with you at the time?

"A. Nobody with me.

"Q. Did you see the Consumer truck before it hit you?

"A. No, I did not."

Answering the interrogatory as to whether the questions were put to him by Mr. O'Brien and whether he made the answers indicated, he said, "Not that I remember." The testimony as to the impeachment of

the witness at the request of the attorney for the individual defendant was admitted only as to the corporate defendant, and the jury was so instructed.

Walter J. Smith, the shorthand reporter, testified about the interview at the Ravenswood hospital on December 29, 1941. He read from his original shorthand notes as to the questions put by Mr. O'Brien and the answers made by plaintiff. Outside of the presence of the jury the attorney for the individual defendant requested the shorthand reporter to read the questions and answers on this interview. The court permitted this to be done, over the objection of the attorney for the corporate defendant. The attorney for plaintiff then stated that in the presence of the jury he would like to ask Mr. Smith, the shorthand reporter, to read certain parts of the interview at the hospital. The attorney for the corporate defendant objected. In the presence of the jury the attorney for plaintiff was permitted to have Mr. Smith testify that in the interview at the hospital the following questions and answers were made:

"Q. Had the truck just started up at the time?

"A. No, both of them were going full speed, otherwise it never would have happened.

"Q. You didn't know it was there until after you were in front of it?

"A. If I got by that Consumer truck I would have been all right."

Lester A. Clark testified that on January 9, 1942 he accompanied Mr. O'Brien to the home of Mr. Dieterich, the individual defendant. He testified as to the questions asked of and the answers made by that defendant. Mr. Earl W. Radford, another shorthand reporter, read from his notes as to questions put to plaintiff and answers made by him in a pretrial deposition taken on August 18, 1942. The testimony of the reporters supported the contention of the corporate defendant as to the statements made by the witnesses in

the interview at the hospital, at the home and in the pretrial deposition. Alfred H. Frederick, a shorthand reporter, also testified as to the pretrial deposition of plaintiff. John Greene, the driver of the truck, called by the corporate defendant, testified that he had been driving automobiles since 1911; that he had been employed by the corporate defendant for 15 years; that it was raining and misty the evening of the accident; that his windshield wipers were working; that the glass on the door was wet with raindrops; that the visibility was bad from the side and that he could not see through the side window "very well." William Dieterich, the individual defendant, called in his own behalf, testified that he was a tool and die maker; that after he stopped his car for the northbound traffic he started out in first speed; that he "Must have gone about 5 to 8 miles an hour"; that he did not get into second speed at any time; that he could "see good" at the time; that he did not see anyone on the crosswalk; that when the front part of his automobile was almost past the crosswalk he felt an impact on the side of his automobile just behind the driver's seat; that he looked around and saw a man falling; that he stopped within 5 feet; that no part of witness's automobile came in contact with the man, so far as he could see; and that there were no marks on the side of witness's car that he knew of. On cross-examination by the attorney for plaintiff, witness stated that after he stopped his car he got out on the right hand side and that the truck was then about 20 to 25 feet away.

The only point urged by the individual defendant is that the verdict as to him is against the manifest weight of the evidence. The testimony of John W. Greene, the driver of the truck, and of William Dieterich, the driver of the Chevrolet automobile, tends to sustain the latter's position that plaintiff walked into the side of the automobile. It is strange that Dieterich, although having a good view to the east, did not

see plaintiff as he walked south on the crosswalk. Deiterich testified that he had a clear view of the crosswalk and that he observed the truck as it was being driven in a westerly direction toward Western avenue. Plaintiff had a right to walk on the crosswalk. He was seen by Mr. Greene as he walked in front of the truck. Both the truck and the automobile were to the right of the center of the street in the direction in which each was proceeding. It is undisputed that plaintiff had walked approximately five feet south of the center of the street before the impact. He testified that he was struck by the front part of the left front fender of Dieterich's automobile, and that he was knocked down on the crosswalk. In our opinion, the evidence warranted the jury in finding that William Dieterich was negligent in the operation of his automobile, that such negligence was the proximate cause of the injuries suffered by plaintiff, and that plaintiff was in the exercise of due care for his own safety. We find that the verdict as to William Dieterich is not against the manifest weight of the evidence.

We turn to a consideration of the contention of the corporate defendant that it was not guilty of negligence as a matter of law. The rule is that negligence and contributory negligence are questions of fact for the jury. They become questions of law only when the evidence is so clearly insufficient to establish negligence or due care that all reasonable minds would reach the conclusion that there was no negligence, or that there was contributory negligence. A motion to direct a verdict for the defendant preserves for review only a question of law, whether from the evidence in favor of plaintiff, standing alone and when considered to be true, together with the inferences which may legitimately be drawn therefrom, the jury might reasonably have found for the plaintiff. The evidence is clear that plaintiff was in the exercise of due care for his own safety. He was walking in a

southerly direction on the crosswalk. He testified that when he was knocked down by the front fender of the Chevrolet automobile, he lay on his shoulder with his "leg facing north"; that he was there "about a couple of seconds"; that he tried to get up; that then he saw the truck 10 or 15 feet away from him; that it was going fast; that he put his head down as he was afraid the truck might run over his head, and that the truck ran over his legs. Although this testimony is contrary to statements which he is alleged to have made in the interview at the hospital and in the pretrial deposition, in passing on a motion for a directed verdict or a judgment notwithstanding the verdict, we are required to assume the truth of such testimony. We are unable to say as a matter of law that the corporate defendant was not guilty of negligence.

The trial court directed Walter Smith, the shorthand reporter, to read in detail, outside of the presence of the jury, the statements made by plaintiff to Mr. O'Brien on December 29, 1941. This reporter had testified in impeachment of the plaintiff. On direct examination he was merely interrogated with reference to the questions put and the answers given, directly impeaching the testimony of the plaintiff, in accordance with the foundation laid prior to that time while the plaintiff was on the stand. Counsel for plaintiff picked out two isolated questions and answers. The answers clearly contain conclusions and inferences that could not be properly introduced as evidence. The conclusions were: "No, both of them were going full speed, otherwise it never would have happened," and "If I got by that Consumer truck I think I would have been all right." We agree with the corporate defendant that under the circumstances shown by the record it was improper to require the reporter to testify as to the isolated questions and answers. It is clear that the jury should not have been permitted to hear these answers contain-

ing conclusions. The corporate defendant also complains that it was prejudiced by the action of plaintiff's attorney in putting the following question to Mr. Smith, the shorthand reporter: "And does it appear from your notes that any nurse came in and asked you to leave because Mr. Risch wasn't in any condition to give a statement?", to which question the witness answered, "No." On motion of defendant the answer was stricken and the jury was instructed to disregard "the last statement." There is no evidence in the record that plaintiff was not in any condition to give a statement, nor was there any evidence that a nurse came in and asked the witness and Mr. O'Brien to leave. We agree that asking this question was likely to create an inference in the minds of the jury that plaintiff's condition was such that he could not give a clear statement of the occurrence and that a nurse did instruct Mr. O'Brien and Mr. Smith to leave. The physical facts in the case presented tend to show that this defendant was not guilty of negligence. The impeaching testimony tends to impair the value of the testimony of plaintiff as to the movement of the truck. In this condition of the record we find that it was error for the court to require the shorthand reporter to read the answers of plaintiff giving his conclusions that both cars were going at full speed, or that the accident would not have happened and that if he "got by" the truck he would have been all right. We would not reverse for that reason alone. In our opinion the verdict is against the manifest weight of the evidence as to the corporate defendant.

The corporate defendant maintains that the court erred in giving an instruction on the credibility of witnesses and the weight to be given to their testimony, on behalf of the individual defendant. It complains of the second paragraph of the instruction, which reads: "If you believe that any witness has knowingly or wilfully testified falsely to any fact ma-

terial to the issues in this case, you are at liberty to disregard the whole of the testimony of such witness, except in so far as the testimony may have been corroborated by other credible evidence or other credible facts and circumstances in the evidence.'' Defendant points out that this instruction was held to be reversible error in *People v. Flynn*, 378 Ill. 351. We observe that the *Flynn* case states that it would have been better to use the expression ''other credible evidence.'' That phrase was used in the instruction in the instant case. However, in the *Flynn* case the court held that the use of the words ''as to any material fact in issue in this case'' without explaining to the jury what facts were material, made the instruction objectionable. The court pointed out that one of defendant's witnesses was impeached on immaterial facts and that ''it may well be that the jury believed she had been impeached, instead, upon material facts.'' In *People v. Wells*, 380 Ill. 347, commenting on the same subject, the Supreme Court said (358)

''Undoubtedly the rule is, that where this instruction is given, other instructions should be given defining the issues, so as not to throw the burden on the jury of ascertaining what are and what are not material issues of fact. Such an instruction has been many times condemned and held to be improper as it leaves the jury to determine the legal question as to what are material facts or essential elements of the crime charged.''

Plaintiff points out that the cases in which the instruction was condemned were criminal cases. In our opinion the remarks of the Supreme Court are applicable to similar instructions given in civil cases. We do not say that we would reverse this case because of the giving of the instruction. However, as the case is to be tried again, the rule laid down in the *Flynn* and *Wells* cases should be observed. The corporate de-

fendant also complains of the refusal of the court to give the following instruction:

"The court instructs you that if you find from the evidence, under the instructions of the court, that the plaintiff was suddenly and without any negligence on the part of the driver of the defendant, Consumers Petroleum Company, placed in a position of danger, then in order to charge the defendant, Consumers Petroleum Company, with the duty to avoid injury to the plaintiff, the plaintiff must show by a preponderance of the evidence that the circumstances were such that the driver of the defendant, Consumers Petroleum Company, had time and opportunity to become conscious, by the exercise of ordinary care, of the facts and circumstances before him. And if you further believe under the instructions of the court, that the circumstances as shown by the evidence did not charge the said defendant, Consumers Petroleum Company, with the duty as thus defined, or if you believe from the evidence under the instructions of the court that the driver of the defendant, Consumers Petroleum Company, did not have an opportunity or reasonable time to perform by the exercise of ordinary care such duty as thus defined, then you should find the defendant, Consumers Petroleum Company, not guilty."

Plaintiff points out that 15 other instructions were given at the request of the attorney for this defendant and that one of these instructions contains a statement of the same theory, to all intents and purposes, as the refused instruction. The court is not required to give repeated instructions announcing the same rule or law but in slightly different language. Under the circumstances, the court did not err in refusing to give this instruction, although we believe it presents defendant's theory in a clearer manner than the one given.

For the reasons stated, the judgment of the circuit court of Cook county is affirmed as to the defendant

William Dieterich, and reversed and the cause remanded as to the defendant Consumers Petroleum Company, a corporation, with directions to proceed in a manner not inconsistent with this opinion. In view of the fact that there is no complaint by defendant or plaintiff as to the amount of damages awarded, on a retrial of the case it will not be necessary for the jury to make any finding as to damages.

*Judgment affirmed as to William · Dieterich and judgment reversed and cause remanded as to Consumers Petroleum Company.*

KILEY, J., concurs.

HEBEL, P. J., took no part.